[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15403
_____

D. C. Docket No. 1:12-cv-22892-UU

JOE HOUSTON,

Plaintiff-Appellant,

versus

MAROD SUPERMARKETS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 1, 2013)

Before HULL and MARTIN, Circuit Judges, and BOWEN,* District Judge.

HULL, Circuit Judge:

_____

*Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District
of Georgia, sitting by designation.

Plaintiff-Appellant Joe Houston, who is disabled, sued Defendant-Appellee Marod Supermarkets, Inc. ("Marod") to compel Marod to bring one of its stores, the Presidente Supermarket, into compliance with the Americans with Disabilities Act ("ADA"). The district court determined that Plaintiff Houston lacked standing and dismissed his complaint for lack of subject matter jurisdiction. After review and with the benefit of oral argument, we conclude that Plaintiff Houston has standing, vacate the dismissal, and remand for further proceedings.

## I. BACKGROUND

### A.    Plaintiff's Title III ADA Claim

Plaintiff Houston is paralyzed, confined to a wheelchair, and disabled. In 2012, Houston filed suit against Marod, alleging that the architectural barriers at the Presidente Supermarket violated Title III of the ADA. 42 U.S.C. §§ 12181-12189 ("Title III").

Title III provides that "[n]o individual shall be discriminated against on the basis of disability" in "any place of public accommodation." 42 U.S.C. § 12182(a). As to public facilities, Title III defines "discrimination" as, inter alia, "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable." Id. § 12182(b)(2)(A)(iv). "[A]ny person who is being subjected to discrimination on the basis of disability in violation of this subchapter [Title III]" may bring a private action. Id. § 12188(a).

2

In his complaint, Plaintiff Houston alleged that he encountered these barriers at the Presidente Supermarket in Miami-Dade County, Florida: (1) a lack of designated disabled use parking spaces, (2) no clear path of travel connecting all essential elements of the supermarket, and (3) restrooms that failed to comply with all necessary ADA regulations.  Houston also alleged that he plans to return to the property to avail himself of the goods and services offered to the public at the property, and to determine whether the property has been made ADA compliant. Houston sought declaratory and injunctive relief as well as attorney's fees and costs.

## B.    Defendant's Motion to Dismiss

Defendant Marod filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).[1]  Marod contended that Houston lacked standing to bring his Title III ADA claim, depriving the district court of subject matter jurisdiction over the suit.  Marod styled its motion as a factual challenge to subject matter jurisdiction.

In its motion, Defendant Marod argued that Plaintiff Houston's litigation history cast doubt on his sincerity to return to the Presidente Supermarket and face future discrimination.   Marod attached to its motion a list of 271 cases in which

---

[1]Rule 12(b)(1) provides: "Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: (1) lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).

3

Houston or an advocacy group he represents was a party, all filed in the Southern and Middle Districts of Florida.[2]  In these cases, Houston or his advocacy group had sued Florida businesses alleging ADA violations.  According to Marod, many of those suits were dismissed for lack of subject matter jurisdiction because Houston lacked standing.[3]  Marod pointed out that Houston in 20 other active cases had professed a desire and intent to revisit the locations that were the subject of these cases, even though those locations are spread over half the state of Florida.  Given that Houston already had asserted his intent to return to so many different locations, Defendant Marod claimed that Houston's professed intent to return to the Presidente Supermarket was not credible and, thus, insufficient to confer standing.

In addition, Defendant Marod contended that Plaintiff Houston could not demonstrate the required imminent threat of future discrimination because there was no "continuing connection" between Houston and the Presidente Supermarket. Marod stressed that (1) Houston lives in Pompano Beach in Broward County, (2)

---

[2]The lists showed that Houston or his advocacy group filed 170 cases in the Southern District of Florida, the district in which Houston resides, and another 101 cases in the Middle District of Florida, which is contiguous to the Southern District of Florida.  It is not unprecedented in this country for advocacy groups and individual members of advocacy groups to find it necessary to file a long trail of lawsuits in federal courts to enforce legal and civil rights.

[3]In 2011, Houston and a co-plaintiff sued "President Supermarket, Inc.," and 12 other entities alleging ADA violations at "Presidente" supermarkets, including this one in Miami-Dade County.  The district court dismissed 12 defendants, including President Supermarket, Inc., for improper joinder.  Subsequently, the district court dismissed the sole remaining defendant for lack of subject matter jurisdiction due to Houston's inability to establish standing.

his home is "approximately 30.5 miles away" from the Presidente Supermarket in Miami-Dade County, and (3) Houston did not state when his prior visits to the store took place or provide any concrete plans or reason to revisit the store in the future.

## C.    Plaintiff's Affidavit in Opposition to Dismissal

In response, Plaintiff Houston submitted an affidavit providing details about his prior visits to the Presidente Supermarket and his future plans to visit the store. Houston has "a motorized wheelchair and a specially equipped van" that allow him to travel. He goes grocery shopping, shops for clothes, goes out to eat, and travels to "various attractions such as Disney World and the Daytona International Speedway." Plaintiff Houston has "shopped at various El Presidente Supermarkets many times over the past ten years or so," because he likes "Spanish food and can find items in those stores not necessarily available at other supermarkets." Houston does "not necessarily shop at the store closest to [his] home." Rather, Houston shops at any number of stores depending on what else he is doing and where he happens to be at the time.

Houston swore that before filing the instant suit, he shopped at this particular Presidente Supermarket on February 24, 2011 and June 15, 2011. Houston's affidavit included a receipt from the second visit, in which he spent $18.92 at the store.

5

Plaintiff Houston further explained that he travels to Miami-Dade County, where the Presidente Supermarket is located, "on a regular basis," and that he expects to be there "in the future." Houston regularly travels to Miami-Dade County because he is vice-president of an advocacy group, Access 4 All, Inc. The group is represented by the law firm of Fuller, Fuller and Associates, whose offices are located in Miami-Dade County. Houston's affidavit included a map showing that the law firm's offices are only 1.8 miles away from the Presidente Supermarket. And, while Houston did not have regularly scheduled meetings with his attorneys, he "definitely" anticipated "going to Fuller, Fuller and Associates['] offices[] . . . in the near future."

Plaintiff Houston also described that when traveling from his home to his lawyers' offices, he drives down I-95, gets off at N.E. 125th Street, and drives east. His usual route takes him right past the Presidente Supermarket. Houston swore that if the supermarket had disabled use parking spaces, ADA-compliant restrooms, and so forth, he "would return to the Defendant's store to shop."

## D.    District Court's Order Granting Motion to Dismiss

The district court found that Plaintiff Houston lacked standing and, consequently, the court lacked subject matter jurisdiction over his ADA claims. The district court applied a four-factor test, used by several district courts in Florida, to assess the likelihood that a plaintiff would return to a defendant's

6

business and suffer future discrimination.  The four factors are: (1) the proximity of the defendant's business to the plaintiff's residence; (2) the plaintiff's past patronage of the defendant's business; (3) the definiteness of the plaintiff's plan to return; and (4) the frequency of the plaintiff's travel near the defendant's business.

As to Plaintiff Houston's past and future visits, the district court did not question that Houston has visited this supermarket in the past and plans to do so in the future.  Rather, the district court found that Houston was a "tester of ADA compliance," was not a "bona fide patron" of the Supermarket, and "plans to return to determine . . . whether the property has been made ADA compliant."  The district court ruled that Houston's test visits are a testing campaign "rather than a genuine prayer for relief by an aggrieved party."

The district court acknowledged that "[c]onstitutional standing requirements do not require that [Houston] tally up a magic number of visits to Defendant's facilities, rather they require that he actually be a bona fide patron."  The district court was persuaded that Houston's "openly stated desire to act as a tester of ADA compliance . . . establishes that he is something other than a bona fide patron."[4]

As to Plaintiff Houston's proximity to the store, the district court observed that because Plaintiff Houston lived 30 miles from Marod's supermarket, "[e]ven if

---

[4]The district court noted that at one point in his affidavit, Plaintiff Houston mistakenly referred to the supermarket as a "motel," "reinforc[ing] the [c]ourt's conclusion that the Complaint was submitted as part of a 'testing' campaign against a broader set of allegedly non-compliant facilities, rather than a genuine prayer for relief made by an aggrieved party."

[Houston] were a frequent visitor to his attorneys' office," the distance between Houston's home and the store "diminishes the likelihood of a continued threat of injury necessitating injunctive relief." The district court concluded that Houston failed to establish that he "face[d] a continuing threat of discrimination from the alleged deficiencies of this particular supermarket" and lacked standing to seek injunctive relief.

## II. STANDARD OF REVIEW

In reviewing a district court's dismissal of a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction, we review the district court's legal conclusions de novo, including the court's conclusion concerning standing. Elend v. Basham, 471 F.3d 1199, 1204 (11th Cir. 2006); see also McElmurray v. Consol. Gov't of Augusta-Richmond Cnty., 501 F.3d 1244, 1241 (11th Cir. 2007). We review the district court's "findings of jurisdictional facts for clear error." City of Vestavia Hills v. Gen. Fidelity Ins. Co., 676 F.3d 1310, 1313 (11th Cir. 2012).

## III. ARTICLE III STANDING

Plaintiff Houston must satisfy three requirements to have standing under Article III of the Constitution: (1) "injury-in-fact"; (2) "a causal connection between the asserted injury-in-fact and the challenged action of the defendant"; and (3) "that the injury will be redressed by a favorable decision." Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001) (internal quotation marks omitted) (citing

8

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992)).  "These requirements are the irreducible minimum required by the Constitution for a plaintiff to proceed in federal court."  Id. (internal quotation marks omitted) (citing Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla., 508 U.S. 656, 664, 113 S. Ct. 2297, 2302 (1993)).  The dispute here is over the first requirement—"injury-in-fact."

The "injury-in-fact" demanded by Article III requires an additional showing when injunctive relief is sought.  In addition to past injury, a plaintiff seeking injunctive relief "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future."  Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1284 (11th Cir. 2001).  Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party shows "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury."  Shotz, 256 F.3d at 1081; Wooden, 247 F.3d at 1284 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 1665 (1983)).

In this case, Plaintiff Houston seeks injunctive relief, which is the only form of relief available to plaintiffs suing under Title III of the ADA.  See 42 U.S.C. § 12188(a) (providing that the remedies available to individuals shall be those set forth in 42 U.S.C. § 2000a-3(a), which allows a private right of action for only injunctive relief for violations of Title II of the Civil Rights Act of 1964, Pub. L.

9

88–352, codified as amended at 42 U.S.C. § 2000a et seq.); Newman v. Piggie

Park Enters., Inc., 390 U.S. 400, 402, 88 S. Ct. 964, 966 (1968) (noting that Title II

of the Civil Rights Act of 1964 permits injunctive relief only).  Therefore, to have

standing, Plaintiff Houston must show past injury and a real and immediate threat

of future injury.

This appeal presents two issues: (1) whether Plaintiff Houston's tester

motive behind his past and future visits precludes his having standing for this

particular lawsuit under Title III of the ADA, and (2), if not, whether under the

totality of the facts here Houston has shown a real and immediate threat of future

injury.

### IV. HOUSTON'S TESTER MOTIVE

The district court made a factual finding that Plaintiff Houston is a tester and

"not a bona fide patron."  While the evidence supports this factual finding, the

threshold question is whether Houston's tester motive deprives him of standing to

sue for violations of 42 U.S.C. §§ 12182(a) and 12182(b)(2)(A)(iv).  We review

those statutes and then relevant precedent as to standing.

**A.**      **Title III of the ADA**

Title III of the ADA addresses "Public Accommodations and Services

Operated by Private Entities."   Section 12182(a) sets for the "[g]eneral rule" that

"[n]o individual shall be discriminated against on the basis of disability in the full

and equal enjoyment" of the facilities or accommodations of "any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

As defined in Title III, the term "public accommodation" includes a "grocery store." Id. § 12181(7)(E). Defendant Marod owns and operates a grocery store, the Presidente Supermarket. Therefore, § 12182(a) provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment" of the facilities and accommodations in the Presidente Supermarket operated by Defendant Marod.

Section 12182(b)(2) in Title III lists examples of what discrimination means for purposes of § 12182(a), including the "failure to remove architectural barriers . . . in existing facilities." Id. § 12182(b)(2)(A)(iv). Plaintiff Houston alleges discrimination in the form of architectural barriers in the Presidente Supermarket.

In turn, §12188 is entitled "Enforcement," and § 12188(a)(1) provides the remedies set forth in 42 U.S.C. § 2000a-3(a) "to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter [Title III]." 42 U.S.C. § 12188(a)(1). The remedies in 42 U.S.C. § 2000a-3(a) include "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order." Section 12188(a)(1) of Title III also provides that "[n]othing in this section shall require a person with a

11

disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter [Title III] does not intend to comply with its provisions."  42 U.S.C. § 12188(a)(1).

This Court has not previously addressed whether a tester can have standing under Title III of the ADA.  However, the Supreme Court and this Court have addressed tester standing under other anti-discrimination statutes, and we start there.

## B.    Tester Standing Under Anti-discrimination Statutes

The Supreme Court has recognized the standing of a tester to pursue a lawsuit to remedy violations of the Fair Housing Act's (FHA) prohibition in § 804(d) against misrepresentations regarding the availability of housing.  See Havens Realty Corp. v. Coleman, 455 U.S. 363, 373–74, 102 S. Ct. 1114, 1121–22 (1982) (involving FHA § 804(d) codified at 42 U.S.C. § 3604(d)).  The Supreme Court in Havens Realty defined "testers" as individuals "who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices."  Id. at 373, 102 S. Ct. at 1121.  The Supreme Court concluded that a black tester who was misinformed about the availability of a rental property had alleged sufficient injury-in-fact to support standing to sue under § 804(d) of the FHA.  Id. at 374, 102 S. Ct. at 1121–22.  The plaintiff-tester in Havens Realty never intended to rent the apartment;

12

rather, his sole purpose was to determine whether the defendant engaged in unlawful practices. Id.

In considering the tester's standing, the Supreme Court in Havens Realty explained that the "'the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." Id. at 373, 102 S. Ct. at 1121 (alterations adopted) (quoting Warth v. Seldin, 422 U.S. 490, 500, 95 S. Ct. 2197, 2206 (1975)); see also Linda R.S. v. Richard D., 410 U.S. 614, 617 n.3, 93 S. Ct. 1146, 1148 n.3 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."). The statutory language of the relevant FHA provision, § 804(d), was therefore critical to the Supreme Court's decision. Havens Realty, 455 U.S. at 373, 102 S. Ct. at 1121.

The Supreme Court noted that FHA's § 804(d) makes it unlawful "[t]o represent to any person because of race . . . that any dwelling is not available for . . . rental when such dwelling is in fact so available." Id. (quoting 42 U.S.C. § 3604(d)). The Supreme Court further observed that Congress made the prohibition in FHA's § 804(d) "enforceable through the creation of an explicit cause of action in § 812(a) of the Act, 42 U.S.C. § 3612(a)." Havens Realty, 455 U.S. at 373, 102 S. Ct. at 1121. The Supreme Court therefore concluded that § 804(d) "establishes an enforceable right to truthful information concerning the

13

availability of housing" and "[a] tester who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions." Id. at 373-74; 102 S. Ct. at 1121.

The Supreme Court admonished "[t]hat the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury within the meaning of § 804(d)." Id. at 374; 102 S. Ct. at 1121. The Supreme Court explained that "[w]hereas Congress, in prohibiting discriminatory refusals to sell or rent in § 804(a) of the Act, 42 U.S.C. § 3604(a), required that there be a 'bona fide offer' to rent or purchase, Congress plainly omitted any such requirement insofar as it banned discriminatory representations in § 804(d)." Havens Realty, 455 U.S. at 374; 102 S. Ct. at 1122.

Subsequently, in Watts v. Boyd Properties, 758 F.2d 1482 (11th Cir. 1985), this Court applied the Supreme Court's rationale in Havens Realty to recognize the standing of a tester to sue under 42 U.S.C. § 1982. The plaintiff "Kathy Watts, a black female, was a volunteer 'tester' for Metro," a nonprofit organization dedicated to eliminating discriminatory housing practices. Id. at 1483-84. Although Watts never intended to actually rent an apartment from the defendant,

14

she inquired about the availability of apartments in the defendant's complex in June of 1982.  Id. at 1483.  Watts was told that no apartment would be available until the fall of 1982.  Id. at 1484.  Shortly thereafter, a white tester working for Metro inquired about the availability of apartments in the same complex.  Id.  The white tester was told that an apartment would be available for rent on July 1, 1982. Id.

Plaintiff Watts brought suit under FHA § 804(d) and under 42 U.S.C. § 1982, alleging that the defendant had intentionally provided Watts with false information about the availability of housing.  Id.  The district court denied the defendant's motion for summary judgment as to Watts's FHA claim but granted it as to her § 1982 claim for lack of standing.  Id.  Because "Watts did not allege any injury to herself arising from a violation . . . of § 1982," the district court concluded that "she was without standing to assert a claim based upon § 1982."  Id.

In reversing the district court's § 1982 ruling, this Court first turned to the language of § 1982, which provides that "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982.  This Court pointed to the similarities between § 1982 and FHA § 804(d), which Havens Realty found to confer standing to a tester.  Watts, 785 F.2d at 1485.   Extending the Supreme Court's rationale in Havens Realty to § 1982, we concluded that

15

"even if a tester is motivated solely by the desire to challenge the legality of allegedly discriminatory practices, this is a sufficient purpose to confer standing" under § 1982.  Id.

In addition to our Circuit's decision in Watts, we review the Tenth Circuit's decision in Tandy v. City of Wichita, 380 F.3d 1277 (10th Cir. 2004), which involved a tester suing under § 12132 of ADA's Title II.  That statute prohibits disability discrimination in the provision of public services.  42 U.S.C. § 12132.  The Tenth Circuit in Tandy observed that § 12132 of Title II includes language substantially similar to FHA § 804(d), which the Supreme Court analyzed in Havens Realty.  Tandy, 380 F.3d at 1286.

Specifically, the Tenth Circuit focused § 12132's phrase that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in . . . the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  Id.  (quoting 42 U.S.C. § 12132) (emphasis and alterations in original).  The Tenth Circuit reasoned that "Title II's words 'no' and 'shall' function like [FHA] § 804(d)'s phrase 'any person' because, read in context, these words clearly proscribe discrimination against any person who is a 'qualified individual with a disability.'"  Id. (emphasis in original).  Thus, according to the Tenth Circuit, "[t]he plain language of Title II evinces Congress' intent to confer upon a 'qualified individual with a disability' a legal right not to be

16

excluded from participation in the services of a public entity by reason of his or her disability." Id.

The Tenth Circuit also considered the language of Title II's enforcement provision, which extends "'remedies, procedures, and rights' under the statute to 'any person alleging discrimination on the basis of disability in violation of [Title II].'" Id. at 1287 (quoting 42 U.S.C. § 12133) (emphasis in Tandy). The Tenth Circuit stated that "the totality of Title II's plain language, the plain language of its enforcement provision, and the statutory scheme's anti-discriminatory purpose lead [that] court to conclude that Congress intended Title II to confer standing to the full limits of Article III." Id. The Tenth Circuit therefore held that "testers have standing to sue under Title II of the ADA." Id.

With these decisions as background, we turn to Houston's claims.

## C.    Tester Motive Does Not Negate Injury-in-Fact

For the following three reasons taken together, we conclude that Houston's status as a tester does not deprive him of standing to maintain his civil action for injunctive relief under 42 U.S.C. §§ 12182(a), 12182(b)(2)(A)(iv), and 12188(a)(1) of the ADA's Title III.

First, the plain language of § 12182(a) confers on Plaintiff Houston a legal right to be free from discrimination on the basis of disability with respect to "the full and equal enjoyment of the . . . facilities" of the Presidente Supermarket." See

17

42 U.S.C. § 12182(a).  The invasion of Houston's statutory right in § 12182(a) occurs when he encounters architectural barriers that discriminate against him on the basis of his disability.  Id. § 12182(b)(2)(A)(iv).  When he encounters those barriers, Plaintiff Houston "has suffered injury in precisely the form the statute was intended to guard against."  Cf. Havens Realty, 455 U.S. at 373-74, 102 S. Ct. at 1121.

This legal right created by §§ 12182(a) and 12182(b)(2)(A)(iv) does not depend on the motive behind Plaintiff Houston's attempt to enjoy the facilities of the Presidente Supermarket.  The text of §§ 12182(a) and 12182(b)(2)(A)(iv) provides no basis for the suggestion that Plaintiff Houston's motive is relevant to this legal right.   The substantive right conferred by the statute is to be free from disability discrimination in the enjoyment of the facility, regardless of Houston's motive for visiting the facility.  Houston suffered an injury when he allegedly encountered architectural barriers at the Presidente Supermarket—notwithstanding that he did so while testing for ADA compliance.  Thus, the tester motive behind Houston's past and future visits to the Presidente Supermarket does not preclude his having standing to sue for invasions of his legal rights under §§ 12182(a) and 12182(b)(2)(A)(iv).  See Havens Realty, 455 U.S. at 373-75, 102 S. Ct. at 1121; Watts, 758 F.2d at 1485; Tandy, 380 F.3d at 1287.

Second, the relevant operative phrases here are (1) "[n]o individual shall be

18

discriminated against on the basis of disability," 42 U.S.C. § 12182(a) (emphasis added); and (2) "any person who is being subjected to discrimination on the basis of disability" may bring suit. Id. § 12188(a)(1) (emphasis added). Nothing in that statutory language precludes standing for tester plaintiffs; if anything, "no individual" and "any person" are broad terms that necessarily encompass testers. These two phrases are similar to the language in FHA § 804(d) which the Supreme Court found to permit tester standing because it prohibits misrepresentations about the availability of housing to "any person." Havens Realty, 455 U.S. at 373-75; 102 S. Ct. at 1121-22. The two phrases are virtually identical to the Title II provisions in Tandy which provide that "no qualified individual" shall be excluded on the basis of disability, see 42 U.S.C. § 12132, and that "any person alleging discrimination on the basis of disability" may sue, see 42 U.S.C. § 12133. See Tandy, 380 F.3d at 1286-87 (concluding that a tester can have standing for a lawsuit under § 12132 of Title II).

Third, Congress has in other anti-discrimination statutes required that a plaintiff have "bona fide"—as opposed to tester—status. In FHA § 804(a) for example, Congress made it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer . . . to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) (emphasis added). In other words, a plaintiff seeking redress for an alleged refusal to sell or to rent housing on the

19

basis of race must have made an actual "bona fide" offer—not a mere "tester" offer.  Congress said so expressly in § 804(a) of the FHA.  But Congress imposed no "bona fide" requirement § 804(d) of the FHA.  Havens Realty, 455 U.S. at 374; 102 S. Ct. at 1122.  And, Congress imposed no "bona fide" requirement in the statutory provisions at issue here, namely 42 U.S.C. §§ 12182(a), 12182(b)(2)(A)(iv), and 12188(a)(1) of the ADA's Title III.

Importantly, Congress has limited other provisions of the ADA's Title III to protect only "clients or customers of the covered public accommodation."  See 42 U.S.C. § 12182(b)(1)(A)(iv).  Congress expressly imposed the "client or customer" limitation for three specific prohibited activities: (i) denial of participation, (ii) participation in unequal benefit, and (iii) separate benefit.  Id. § 12182(b)(1)(A)(i-iii).

But Congress made clear that the "client and customer" limitation applies only to these three prohibited activities.  See 42 U.S.C. § 12182(b)(1)(A)(iv). Congress imposed no such limitation in the provisions of Title III upon which Plaintiff Houston relies, which are §§ 12182(a), 12182(b)(2)(A)(iv), and 12188(a)(1).  See Menkowitz v. Pottstown Mem'l Med. Ctr., 154 F.3d 113, 121-22 (3d Cir. 1998) (holding that "both the language of Title III and its legislative history clearly demonstrate [that] the phrase 'clients or customers,' which only appears in 42 U.S.C. § 12182(b)(1)(A)(iv), is not a general circumscription of

20

Title III and cannot serve to limit the broad rule announced in 42 U.S.C. § 12182(a)," and noting that the "[t]he operative rule announced in Title III speaks not in terms of 'guests,' 'patrons,' 'clients,' 'customers,' or 'members of the public' but, instead, broadly uses the word 'individuals.'"); Molski v. M.J. Cable, Inc., 481 F.3d 724, 733 (9th Cir. 2007) (holding that the "client or customer" limitation of § 12182(b)(1)(A)(iv) does not apply to § 12182(a) or to § 12182(b)(2)(A)(iv)); see also PGA Tour, Inc. v. Martin, 532 U.S. 661, 679, 121 S. Ct. 1879, 1891 (2001) (noting that § 12182(b)(1)(A)(iv) "is not literally applicable to Title III's general rule prohibiting discrimination against disabled individuals" and holding that "Title III's broad general rule contains no express 'clients or customers' limitation, § 12182(a), and § 12182(b)(1)(A)(iv) provides that its limitation is only '[f]or purposes of' the clauses in that separate subparagraph.").

These examples illustrate that Congress has said so expressly when it wants to limit the class of people protected by anti-discrimination statutes to only clients or customers or to people of bona fide status. But Congress expressed no such limitation in the parts of Title III that are relevant to Plaintiff Houston's lawsuit. This absence of legislative language restricts our interpretation, as we are "not allowed to add or subtract words from a statute." Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1224 (11th Cir. 2009). Because our task is

21

merely "to apply statutory language, not to rewrite it,"  Harris v. Garner, 216 F.3d 970, 976 (11th Cir. 2000), we are not at liberty to impose a "bona fide patron" requirement for Plaintiff Houston's lawsuit for violations of §§ 12182(a) and 12182(b)(2)(A)(iv) of Title III,  see T-Mobile South, LLC v. City of Milton, Ga., No. 12-10487, --- F.3d ----, 2013 WL 4750549, at *10 (11th Cir. Sept. 5, 2013) ("Our duty is to say what statutory language means, not what it should mean, and not what it would mean if we had drafted it.");  Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 228, 128 S. Ct. 831, 841 (2008) ("We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable.").

We hold that Plaintiff Houston's tester motive behind his visits to the Presidente Supermarket does not foreclose standing for his claim under 42 U.S.C. §§ 12182(a), 12182(b)(2)(A)(iv), and 12188(a)(1) of Title III.  By the same token, we conclude that "bona fide patron" status is a not a prerequisite for Houston to obtain standing for a lawsuit under these statutory provisions.  Stated differently, the alleged violations of Houston's statutory rights under Title III may constitute an injury-in-fact, even though he is a mere tester of ADA compliance.  But this conclusion alone is not enough.  Because Plaintiff Houston seeks injunctive relief, he also must show a real and immediate threat of future injury.  We address this issue next.

22

## V. HOUSTON'S STANDING TO SEEK INJUNCTIVE RELIEF

As noted earlier, Plaintiff Houston's "standing to seek the injunction requested depend[s] on whether he [i]s likely to suffer future injury." Lyons, 461 U.S. at 105, 103 S. Ct. at 1667. Houston "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." Wooden, 247 F.3d at 1283. That requires "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." Shotz, 256 F.3d at 1082; Wooden, 247 F.3d at 1283. This Court has addressed the requirement of a real and immediate threat of future injury in two prior ADA cases. See Shotz, 256 F.3d at 1081; Stevens v. Premier Cruises, Inc., 215 F.3d 1237 (11th Cir. 2000). Both cases involved motions to dismiss where we addressed standing based on facts alleged in the complaint taken as true for purposes of the motions. We examine both cases below.

### A. Circuit Precedent

In Shotz, this Court held that the plaintiffs lacked standing to pursue their disability discrimination claims under § 12132 of the ADA's Title II. 256 F.3d at 1082. The Shotz plaintiffs alleged that they had encountered architectural barriers when they visited a Levy County, Florida courthouse in July of 1999. Id. at 1078-79. The plaintiffs sought "injunctive relief compelling [Levy] County to comply

23

with the ADA." Id. at 1079.

The district court in Shotz dismissed the plaintiffs' complaint because, inter alia, plaintiffs had failed to sufficiently allege their standing to pursue injunctive relief. On appeal, this Court explained that "a plaintiff lacks standing to seek injunctive relief unless he alleges facts giving rise to an inference that he will suffer future discrimination by the defendant." Id. at 1081(emphasis added). We concluded that the Shotz plaintiffs failed to "allege a real and immediate threat of future discrimination" because their "complaint contain[ed] only past incidents of discrimination." Id. at 1082. We observed that "since their July 1999 visit to the Levy County Courthouse, the plaintiffs have not attempted to return, nor have they alleged that they intend to do so in the future." Id. We explained that "[a]bsent such an allegation, the likelihood of future discrimination remains conjectural, hypothetical, or contingent, and not real and immediate." Id. (internal quotation marks omitted) We, therefore, concluded that the Shotz plaintiffs lacked Article III standing to sue for injunctive relief. Id.

In contrast, in Stevens, this Court concluded that the plaintiff had standing to seek an injunction under ADA's Title III. 215 F.3d at 1239. The Stevens plaintiff took a trip aboard defendant's cruise ship and allegedly discovered multiple ADA violations, including a lack of wheelchair accessible cabins and paths to public areas. Id. at 1238-39.

24

The district court in <u>Stevens</u> dismissed the plaintiff's complaint on two grounds. <u>Id.</u> First, because the plaintiff sought only injunctive relief but did not allege a threat of future injury, the district court concluded that the "[p]laintiff had not pleaded properly her standing to pursue the ADA claim." <u>Id.</u> Second, the district court concluded that the ADA did not apply to the defendant's foreign-flag cruise ship as a matter of law. <u>Id.</u> The plaintiff moved for reconsideration and sought leave to amend her complaint so that she could "cure the failure to plead standing to pursue injunctive relief." <u>Id.</u> The plaintiff attached a proposed amended complaint to her motion in which she alleged that "in the near future, she would take another cruise aboard Defendant's ship." <u>Id.</u> The district court denied leave to amend, reasoning that the amendment would be futile given the inapplicability of the ADA to the defendant's foreign-flag ship. <u>Id.</u>

On appeal, this Court concluded that the defendant's foreign-flag ship was covered by Title III of the ADA. <u>Id.</u> at 1242-43. Amending the complaint to cure the standing deficiency was, therefore, not a futile exercise. This Court thus reversed the district court's denial of leave to amend. <u>Id.</u> We noted that a plaintiff pursuing "injunctive relief in federal court must plead a genuine threat of imminent injury." <u>Id.</u> This Court was "satisfied" that the <u>Stevens</u> plaintiff's allegation that she would take another cruise aboard defendant's ship "in the near future" was sufficient to properly allege standing for injunctive relief under Title III of the

ADA.  Id.[5]

We now turn to Houston's case.

## B.    Houston has Standing

As demonstrated in Shotz, in a motion to dismiss, we usually "evaluate standing based on the facts alleged in the complaint."  256 F.3d at 1081.  Here, however, Defendant Marod in his Rule 12(b)(1) motion attacked Plaintiff Houston's standing in a factual challenge—as opposed to a facial challenge.  Facial attacks to subject matter jurisdiction require the court merely to look and see if the plaintiff's complaint has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.  Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009).  However, in a factual challenge to subject matter jurisdiction, a district court can "consider extrinsic evidence such as deposition testimony and affidavits."  Id.  In so doing, a district court is "free to weigh the facts" and is "not constrained to view them in the light most favorable" to the plaintiff.  Id.

Here, both Marod and Houston filed and argued evidence outside the complaint.   But the relevant facts contained in their evidence were not disputed,

---

[5]Defendant Marod argues that our decision in Stevens conflicts with the Supreme Court's holding in Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130 (1992), that "some day intentions" are not enough.  Id. at 564, 112 S. Ct. at 1238.  We need not address that issue because, as explained in our Lujan discussion later, the facts in Houston's case establish more than the plaintiff did in Stevens and satisfy Lujan.

such as (1) Houston's two prior visits to the Presidente Supermarket, (2) his proximity to the store, (3) his averments as to future visits, and (4) that Houston is an ADA tester who has filed many similar lawsuits.  Indeed, the district court acknowledged that Houston plans to return to the supermarket.  Having concluded that Houston's undisputed tester motive behind his plan to return does not defeat standing, we now conclude that the other undisputed facts are sufficient to establish Houston's standing.

Plaintiff Houston had two undisputed past encounters of the alleged architectural barriers in the Presidente Supermarket.  While "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy," Lyons, 461 U.S. at 103, 103 S. Ct. at 1666, the plaintiff's exposure to illegal conduct in the past is nonetheless "evidence bearing on whether there is a real and immediate threat of repeated injury," O'Shea v. Littleton, 414 U.S. 488, 496, 94 S. Ct. 669, 676 (1974).  As this Court stated in Shotz, a plaintiff seeking an injunction under Title III either must "have attempted to return" to the non-compliant building or at least "intend to do so in the future." 256 F.3d at 1081.

Plaintiff Houston has visited this particular supermarket twice and encountered the alleged architectural barriers during each visit.  He submitted a receipt from the second visit.  We therefore note that Houston did, in fact, return to

the Presidente Supermarket before filing this lawsuit, even after he had faced the alleged barriers during his first visit.

Turning to the 30.5 mile distance between Plaintiff Houston's residence and the Presidente Supermarket, we understand that this particular store is not the closest supermarket to Houston's home. But Houston explained his reason to go to this store: he travels to Miami-Dade County, where the Presidente Supermarket is located, "on a regular basis," and Houston expects to be there in the future. Houston takes these trips to Miami-Dade County because his lawyer's offices are located there—less than two miles from the Presidente Supermarket. And because of his many ADA lawsuits, Plaintiff Houston "definitely" anticipates going to his lawyer's offices "in the near future." Houston passes the Presidente Supermarket on his way to and from his lawyer's office. According to his affidavit, Houston therefore "would return to the Defendant's store to shop if [he] were able to park in the parking spaces, have accessible restrooms, and be able to avail [him]self of the store's other facilities."

Under these particular, undisputed facts, we cannot say that a distance of 30.5 miles makes the threat of future injury conjectural. Of course, different facts may demand a different conclusion. Plaintiff Houston lives in the next county. He does not live hundreds of miles away from the store with no particular reason to return.

28

In light of the totality of the undisputed facts here, we conclude that Plaintiff Houston has standing to seek injunctive relief for violations of 42 U.S.C. §§ 12182(a) and 12182(b)(2)(A)(iv) of the ADA's Title III.  See Shotz, 256 F.3d at 1081.  There is no indication in the record that the alleged architectural barriers in the Presidente Supermarket have been remedied.  As a result, there is a 100 percent likelihood that Plaintiff Houston will suffer the alleged injury again when he returns to the store.  Cf. 31 Foster Children v. Bush, 329 F.3d 1255, 1266 (11th Cir. 2003) (holding that "when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again").

The likelihood of Houston suffering future injury thus is not contingent upon events that are speculative or beyond his control.  Cf. Lyons, 461 U.S. at 107-09, 103 S. Ct. at 1668-69 (holding that the plaintiff lacked standing for injunctive relief because it was speculative that police officers would arrest him again and that those police officers would then apply an allegedly unconstitutional chokehold again).  Rather, the cause of the injury continues to exist, and the likelihood of Houston encountering that cause in the future depends only on Houston's own volition.  Houston has been to the store in the past, he wants to return, and his frequent trips directly past the store render it likely that he would do so were it not for the alleged ADA violations in the Presidente Supermarket.  Under the totality

29

of the facts here, the threat of future injury to Houston is not merely "conjectural" or "hypothetical." Instead, it is "real and immediate." See Church v. City of Huntsville, 30 F.3d 1332, 1337-39 (11th Cir. 1994) (finding standing for homeless plaintiffs to seek injunctive relief to stop certain police practices).[6]

## C.    Lujan and Our Progeny

We reject Defendant Marod's argument that recognizing Houston's standing conflicts with the Supreme Court's decision in Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130 (1992). We explain why.

In Lujan, the Supreme Court considered the standing of two plaintiffs under the Endangered Species Act. 504 U.S at 562-64, 112 S. Ct. 2137-38. The first plaintiff sued to enjoin the rehabilitation of the Aswan High Dam in Egypt because of endangered Nile crocodiles. Id. at 563; 112 S. Ct. at 2138. In a 1988 affidavit, this first plaintiff stated that she had traveled to Egypt in 1986 and "'observed the traditional habitat of the endangered [N]ile crocodile there and intends to do so again, and hopes to observe the crocodile directly.'" Id. (alterations adopted). She also swore that she intended to return and at that time would "'suffer harm in fact

---

[6]As noted earlier, the district court applied a four-factor test to determine whether Houston faces a real and immediate threat of future injury. Those four factors are (1) the proximity of the defendant's business to the plaintiff's residence; (2) the plaintiff's past patronage of the defendant's business; (3) the definiteness of the plaintiff's plan to return; and (4) the frequency of the plaintiff's travel near the defendant's business. While we considered each of the four factors in reaching our decision today, we note that these factors are not exclusive and that no single factor is dispositive. District courts must consider the totality of all relevant facts to determine whether a plaintiff faces a real and immediate threat of future injury.

as the result of the American role in overseeing the rehabilitation of the Aswan High Dam on the Nile and in developing Egypt's Master Water Plan.'" Id. (alterations adopted).

The second plaintiff in Lujan sought to protect various endangered species in Sri Lanka, after having traveled there only once, in 1981. Id. When questioned about her intent to return to Sri Lanka during her deposition, the second plaintiff confessed that she had no current plans: "'I don't know [when]. There is a civil war going on right now. I don't know. Not next year, I will say. In the future.'" Id. at 564; 112 S. Ct. at 2138 (alterations adopted). Indeed, except for a generalized wish to return to Egypt and Sri Lanka "in the future," neither plaintiff offered any indication as to when they would next visit the environmental treasures they hoped to rescue. Id. at 563-64, 112 S. Ct. at 2138. The Supreme Court held that "such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." Id. at 564, 112 S. Ct. at 2138.

In Elend v. Basham, 471 F.3d 1199 (11th Cir. 2006), this Court relied on Lujan in affirming the district court's dismissal for lack of standing. Elend, 471 F.3d at 1209. In Elend, the plaintiffs protested outside of the Sun Dome in Tampa when President George W. Bush attended a political rally there in 2002. Id. at

1202. The Secret Service ordered the plaintiffs to move to a "protest zone," which was further away from the venue than the plaintiffs wished to be. Id. at 1202-03. The plaintiffs sought to enjoin the Secret Service from taking similar action in the future, and they claimed to have standing because they "fully intend to peacefully express their viewpoints in the future in a manner similar to their activities on November 2, 2002 in concert with presidential appearances at the . . . Sun Dome and at other locations around the country." Id. at 1204.

In Elend, this Court affirmed the district court's dismissal for lack of standing. We explained that "the [p]laintiffs' avowed intention to protest in a similar manner in the future is akin to the plaintiff in Lujan who declared, 'I intend to go back to Sri Lanka [to observe endangered species], but confessed that she had no current plans: I don't know [when].'" Elend, 471 F.3d at 1209 (quoting Lujan, 504 U.S. at 564, 112 S. Ct. at 2138).

In four additional cases, this Court applied Lujan's holding that "some day intentions" are not enough. See Nat. Parks Conservation Ass'n v. Norton, 324 F.3d 1229 (11th Cir. 2003); Fla. State Conf. of the NAACP v. Browning, 522 F.3d 1153 (11th Cir. 2008); ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177 (11th Cir. 2009); Harrell v. The Florida Bar, 608 F.3d 1241 (11th Cir. 2010). In all four cases, we concluded that the plaintiffs had Article III standing, given the particular facts in each case.

32

First, in <u>Norton</u>, two environmental organizations sued the National Park Service for violating the equal protection rights of their members by failing to evict the occupants of the Stiltsville properties (buildings on stilts in the middle of Biscayne National Park) following the expiration of the lease agreement between the occupants and the National Park Service. 324 F.3d at 1231. The plaintiffs claimed that this failure was "tantamount to the grant of an exclusive lease to the occupants." <u>Id.</u> at 1234.

This Court reversed the district court's dismissal for lack of standing in <u>Norton</u> because the plaintiffs had visited the Biscayne Bay National Park frequently in the past and "indicated an intent to maintain the frequency of these visits in the future." <u>Id.</u> at 1242. We emphasized that unlike the plaintiffs in <u>Lujan</u>, the plaintiffs in <u>Norton</u> "state with particularity that they have definite plans to continue visiting Stiltsville with precisely the same frequency that they have to date, and that in the absence of remedial action they will continue to experience the aesthetic and recreational harms described." <u>Id.</u> at 1243.

In <u>Browning</u>, we also concluded that the plaintiffs satisfied <u>Lujan</u>'s immediacy requirement. 522 F.3d at 1161. There, a group of voting rights organizations sued the State of Florida in September 2007, alleging that the state violated a number of their members' constitutional and statutory rights to vote. <u>Id.</u> at 1158. The state required that all voter registration applicants provide

33

information, such as an address and a driver's license number. Id. at 1156. The state would not register an applicant if the information provided by the applicant did not match the state's own information database. Id. at 1156-57. The plaintiffs alleged that this procedure, in many cases, would leave applicants with too little time to fix the database-matching error before voter rolls closed in advance of an upcoming election. Id.

In Browning, this Court affirmed the district court's denial of the state's motion to dismiss for lack of standing. After explaining that "[a]n imminent injury is one that is likely to occur immediately," Browning, 522 F.3d at 1161, we noted that the plaintiffs had alleged the "denial of voter registration and hence the right to have one's vote counted," which would occur "before the scheduled elections in November 2008." Id. The plaintiffs also alleged that "they intend to increase voter registration efforts and anticipate increased registration applications ahead of the upcoming presidential election." Id. We held that these allegations satisfied Lujan's immediacy requirement. Id.

This Court reached the same conclusion in ACLU of Florida. In that case, the parent of a student sought to enjoin the school board after that board removed a certain book from the school's library. ACLU of Fla., 557 F.3d at 1182-83. The school board argued that the parent lacked standing because she failed to present the imminent injury that Lujan requires. Id. at 1190.

34

This Court analyzed Lujan and synthesized our prior cases addressing Lujan's immediacy requirement. We concluded that "[t]he key in all . . . of our decisions applying Lujan is that immediacy requires only that the anticipated injury occur with[in] some fixed period of time in the future." Id. at 1193 (internal quotation marks omitted). We explained that "[i]mmediacy, in this context, means reasonably fixed and specific in time and not too far off." Id. at 1193-94.

In light of this analysis, this Court concluded in ACLU of Florida that the parent had standing. Her declaration stated that she had seen the book in question in the library with her son and "had planned to check it out and read it together [with her son] in the future." Id. at 1194. The parent also averred that, without the requested injunction, she and her son "will not be able to [check out the book] when the school resumes on August 14, 2006." Id. This Court noted that the parent's declaration anticipated checking out the book on a specific date six weeks after the declaration was signed and, thus, provided "a specific intention pegged to a sufficiently fixed period of time." Id. We concluded that "Lujan and our decisions interpreting it require no more immediacy than that." Id. at 1195.

This Court also distinguished Lujan in Harrell. The Harrell plaintiff alleged that a Florida Bar Rule prohibited the type of advertisements he wanted to run, in violation of his rights under the First Amendment. 608 F.3d at 1247. Relying on the reasoning in Lujan, the district court dismissed the case for lack of standing

35

after concluding that the plaintiff's "claimed injury-in-fact was not sufficiently concrete or imminent because he failed to identify a date on which he proposed to run his desired advertisements." Id. at 1260 n.7. This Court reversed because "unlike the vague, 'some day' intentions of the wildlife enthusiasts in Lujan to return to Egypt and observe a Nile crocodile, [the plaintiff's] intense professional dependence on advertising makes it very likely that he will attempt to run advertisements of the kind he describes in his declaration." Id.

Applying these principles to Houston's case before us, we conclude that our decision today is wholly consistent with the reasoning in Lujan. Plaintiff Houston's intent to return to the Presidente Supermarket cannot be characterized as the unspecified "some day" intentions that the Supreme Court found too speculative in Lujan. 504 U.S. at 564, 112 S. Ct. at 2138. The Presidente Supermarket is neither in Egypt nor in war-torn Sri Lanka. It is located in Miami-Dade County, which is next to Broward County where Houston resides. Houston shopped at the Presidente Supermarket twice in the months before filing this lawsuit, whereas the Lujan plaintiffs' visits to Egypt or Sri-Lanka occurred several years before filing suit.

Immediacy is an "elastic concept," Lujan, 504 U.S. at 564 n.2, 112 S. Ct. at 2138 n.2, and in this context "means reasonably fixed and specific in time and not too far off," ACLU of Fla., 557 F.3d at 1193-94. This Court held that the

36

plaintiffs in <u>Norton</u>, satisfied <u>Lujan</u>'s immediacy requirement because they had visited the Biscayne Bay Park frequently in the past and intended to do so in the future. 324 F.3d at 1243. Plaintiff Houston has traveled to Miami-Dade County on a regular basis in the past and expects to do so in the near future. Indeed, he drives right by the store on a regular basis, he entered the store on two prior occasions, and he would do so again if the store were ADA compliant. That is enough; like the plaintiffs in <u>Norton</u>, Houston has frequently visited the area near the store in the past and will maintain the same frequency in the future. <u>Id.</u>

Moreover, in <u>Harrell</u>, this Court held that the plaintiff satisfied <u>Lujan</u> because his "intense professional dependence" on the activity that the defendant prohibited made it likely that he would suffer the injury again. <u>Harrell</u>, 608 F.3d at 1260 n.7. Given that ADA testing appears to be Houston's avocation or at least what he does on a daily basis, the likelihood of his return for another test of the Presidente Supermarket, which is located on his routine travel route, is considerably greater than the <u>Lujan</u> plaintiffs' return to far away countries with unstable political situations. <u>See Harrell</u>, 608 F.3d at 1260 n.7 (distinguishing <u>Lujan</u> by explaining that the nature of the plaintiff's business renders the likelihood of future injury greater than the "some day" aspirations to revisit Egypt and Sri Lanka of the <u>Lujan</u> plaintiffs).

Finally, Houston has offered the "description of concrete plans" that the

Supreme Court found missing in <u>Lujan</u>: Plaintiff Houston visits his lawyer's offices near the Presidente Supermarket on a frequent basis and, thus, drives by the store frequently. During these trips to his lawyer's office in the near future, he wants to visit the store. Unlike the plaintiffs in <u>Lujan</u>, Houston has averred a concrete and realistic plan of when he would visit the store again.

In sum, we conclude that under the specific facts in the record before us, Plaintiff Houston has standing to seek injunctive relief against Defendant Marod. We caution, however, that determining standing for injunctive relief is often a fact-sensitive inquiry, as it is in this case. Each plaintiff must establish standing on the facts of the case before the court. That is equally as true about a regular customer of a public accommodation as it is for a tester like Plaintiff Houston.

## IV. CONCLUSION

For the reasons set forth above, we vacate the district court's dismissal for lack of subject matter jurisdiction and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

BOWEN, District Judge, dissenting:

Article III of the United States Constitution requires a genuine case or controversy be before the court in order for the court to rule on it.  Accordingly, our standing jurisprudence exists to separate those cases that present a case or controversy from those that simply ask the court to issue an advisory opinion.  In the present case, I fully agree with the district court that this plaintiff "tester" lacked standing to sue.  Therefore, I respectfully dissent from the scholarly, detailed, but mistaken opinion of the majority.

The Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (2006), is counted among the most salutary remedial laws ever passed by a well-intended Congress.  See PGA Tour, Inc. v. Martin, 532 U.S. 661, 676 (2001) ("[T]he [ADA] has been described as a milestone on the path to a more decent, tolerant, and progressive society.") (internal quotations and citations omitted).  Because of its commendable purpose, its provisions are liberally construed.  See § 12101(b)(1) ("It is the purpose of [the ADA] to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."); Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 212 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth.").  The district court, mindful of its obligations under the law, approached this case with

39

circumspection, obedient to Congress' intent and the mandate of the ADA.

Consistent with Rule 12(b)(1) of the Federal Rules of Civil Procedure, the district court assembled, reviewed, and determined whether underlying facts supported its subject-matter jurisdiction in the instant matter. See U.S. Const. Art. III § 2 ("The judicial Power shall extend to . . . Cases [and] . . . Controversies."). Those facts, properly considered by the district court, are beyond cavil.

The Plaintiff is a serial litigator. The misfortune of his disability does not make him less so. Plaintiff has been a party to 170 cases in the Southern District of Florida and 101 in the Middle District.[1] His travels up, down, and across the byways of South Florida, doggedly in search of a grievance to call his own, are worthy of a Carl Hiassen plot. Seeking injunctions, costs in every variety, and monetary grist for the mills of his attorneys' offices (the wheels of which surely grind exceeding expensive), this plaintiff is doubtless a force with which many a small business will reckon.

In a thoroughly departmental way, the majority parsed the prongs and principles of standing better applied to a more typical plaintiff in a more conventional case. There is nothing conventional about this matter. The district court (in more polite terms) identified the Plaintiff for what he is: the volunteer

---

[1] It should be noted that, unless he has been allowed some remission or reduction thereof, Plaintiff's filing fees alone in these cases would amount to $108,000.00 at today's rates in the two districts.

40

point man for a litigation combat patrol.

The majority fail to see a distinguishing principle between the roles of a "tester" under the ADA and a "tester" under the Fair Housing Act, 42 U.S.C. §§ 3601-3631 (2006). To me, the distinction readily appears. In a Fair Housing Act case, the permit extended to a "tester" is grounded in necessity. In such an endeavor the "tester" is seeking to unearth information and evidence which bears upon the motive, intent, and state of mind of those who would covertly or secretly practice invidious discrimination. Cf. Sec'y of U.S. Dep't of Hous. and Urban Dev. ex rel. Herron v. Blackwell, 908 F.2d 864, 870 (11th Cir. 1990) (applying the burden-shifting framework used in a Title VII employment discrimination case to root out veiled discrimination in a FHA case) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). On the other hand, in an ADA case the so-called "tester" is a self-appointed private attorney general foraging for conditions, defects, and shortcomings which are physically manifest for all who would see. Accordingly, even the nomenclature of a "tester" in a Title III ADA case is inappropriate.

The district court did not dismiss the case because it labeled Houston a "tester." It dismissed Houston's complaint because this plaintiff has no standing to bring this case. As found by the district court, "The ADA permits suits to be brought by any person who is subjected to discrimination on the basis of disability

41

or who has reasonable grounds for believing that he is about to be subjected to discrimination on that basis." Nevertheless, although Congress may create legal rights and interests in others, it may not bypass the Constitution's "Case or Controversy" requirement. Warth v. Seldin, 422 U.S. 490, 501 (1975). Thus, as the district court properly observed, the fundamental issue before it was whether Houston had "constitutional standing to bring this action against [Marod Supermarkets]."

The crux of the district court's inquiry was whether the plaintiff had demonstrated a likelihood that he would "return to [Presidente Supermarket] and continue to suffer" from its noncompliance with the ADA. Carefully sifting Houston's complaint and supplemental affidavit, the district court found four factors dispositive in its inquiry: (1) the thirty-plus miles separating the Supermarket and Houston's residence; (2) Houston's negligible previous patronage of the defendant's business; (3) Houston's "plans" to return to the Supermarket, not to continue his nonexistent patronage of the Supermarket, but rather to only further his litigation interests; and (4) Houston's intermittent travel to his attorneys' law offices to pursue his litigation interests. The district court ultimately concluded that Houston failed to demonstrate the threat of an actual and imminent injury at the hands of Defendant. Moreover, Houston's vague, generalized affidavit and own reference to Defendant's Supermarket as a "motel" further

heightened the court's skepticism that his complaint was "a genuine prayer for relief made by an aggrieved party."

It is my conclusion that the district court was not only not clearly erroneous, but entirely correct in its decision that this plaintiff "tester" lacked standing to sue. That this plaintiff has uttered some incantations about his intentions to visit a grocery store over thirty miles from his home (about a gallon of gasoline in the best of cars), possibly to make another eighteen-dollar purchase, should be of no avail. This Court should see this case as the district court saw it–-a disingenuous medium for self-promotion and the multiplication of attorney's fees. See 42 U.S.C. § 12205. Despite Houston's obvious intent in pursuing these 271 lawsuits, "'[t]he province of the Court is solely to decide on the rights of individuals.' Vindicating the public interest . . . is the function of Congress and the Chief Executive." Lujan, 504 U.S. at 576 (1992) (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803) (Marshall, C.J.)) (emphasis added).

The majority's rigid focus on the conventional criteria for standing obscures the facts the district court so clearly perceived. "What you see, yet cannot see over, is as good as infinite." Thomas Carlyle, 2 Sartor Resartus 84 (London, William Clowes & Sons 1838) (1833).

Because this plaintiff lacks standing to bring this lawsuit, I would affirm the district court in its dismissal of the case.